UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

BARBARA GIBBS,

                Plaintiff,

        -against-

JO ANNE BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 25 2005 ★

BROOKLYN OFFICE

**NOT FOR PUBLICATION**

04-CV-3424 (ERK)

**MEMORANDUM & ORDER**

KORMAN, Chief Judge.

Plaintiff applied for disability insurance benefits on September 29, 1998, alleging an onset date of August 8, 1996. (Tr. 48). She claimed that she was disabled due to injuries to her back and right knee sustained when she slipped and fell while working as a home health attendant. (Tr. 48, 53, 89). The application was denied initially and upon reconsideration. (Tr. 25-33). Plaintiff requested a hearing, which was held on August 30, 1999 before the ALJ. (Tr. 34, 261-71). Plaintiff appeared with her attorney and testified. (Id.). The ALJ found that plaintiff was capable of performing the full range of sedentary work. (Tr. 202). The Appeals Council granted plaintiff's request for review and remanded the case for further proceedings. (Tr. 210-14). On December 2, 2003, plaintiff with her attorney before another ALJ. (Tr. 272-86). The ALJ considered the case *de novo* and on March 13, 2004, found that plaintiff was not disabled. (Tr. 9-19). The decision became final when the Appeals Council denied plaintiff's request for review on June 18, 2004. (Tr. 4-7).

1

Plaintiff then commenced the instant action. The Commissioner moved to remand for further administrative proceedings pursuant to 42 U.S.C. § 405(g). Plaintiff cross-moved for judgment on the pleadings, seeking reversal and remand for calculation of benefits only.

## BACKGROUND

### 1. Medical Evidence – Treating Physicians

### a) Treating Physicians Zablozki and Krishna

Plaintiff first visited Dr. Vera Zablozki, neurologist, on August 13, 1996, complaining of lower back and right knee pain resulting from her fall. (Tr. 89). Dr. Zablozki's motor examination revealed "positive paraspinal muscle tenderness in the lumbrosacral region with 4+ /5 weakness of the right ankle dorsiflexion and extensor halluces longus muscle." (Id.). The sensory examination revealed "an increase to pinprick and light touch sensory threshold on the dorsum of the right foot, inclusive of the first web space." (Tr. 89-90). She opined that plaintiff's deep tendon reflexes were "2+ and symmetrical with flexor plantar responses bilaterally," that the plaintiff's "gait is antalgic," and that there is "a positive straight leg raising sign at 30° on the right." (Tr. at 90). Dr. Zablozki ruled out right L5 radiculopathy and right superficial peroneal nerve palsy, but clarified that her diagnoses were presumptive. (Id.). She advised the plaintiff to "refrain from physically strenuous activity such as prolonged standing and walking," follow-up within six weeks, and obtain an MRI scan of the lumbrosacral spine "to rule out a herniated disc that may have occurred at the time of the fall." (Id.). Dr. Zablozki stated that an EMG/nerve conduction study might be necessary if plaintiff's symptoms did not improve. The doctor prescribed Vicodin ES for pain management. (Id.).

2

The following day, upon the referral of Dr. R.C. Krishna, a doctor who worked in the same facility as Dr. Zablozki, plaintiff received an x-ray of the lumbosacral spine. (Tr. 188). Dr. Michael Katz performed the x-ray and opined that it was "normal." (Id.).

Plaintiff received an MRI on October 21, 1996, which was performed by Dr. Harold Parnes. (Tr. 91). Dr. Parnes opined that "straightening of the normal curvature of the lumbar spine was seen on the sagittal images" and that "posterior bulging discs were identified at the L3-4, L4-5 and L5-S1 levels." (Id.). He recommended clinical correlation. (Id.). On the same day, Dr. Zablozki conducted an EMG/nerve conduction study. (Tr. 92). Dr. Zablozki noted that plaintiff's "persistent low back pain had been increasing in intensity and frequency," and that her symptoms at the time suggested lumbosacral radiculopathy. (Id.). The study revealed abnormal results due to the presence of right L5 lumbar radiculopathy. Dr. Zablozki recommended that plaintiff continue with her current therapy and advised her to refrain from physically strenuous activities, such as "heavy lifting, bending, prolonged sitting and standing." She also told plaintiff to make a follow-up appointment to correlate the findings of the EMG/nerve study with the results of the MRI. (Id.).

Plaintiff saw Dr. Krishna on January 7, 1997. (Tr. 180). Dr. Krishna diagnosed plaintiff with right L5 radiculopathy, bulging discs at the L3-S1 levels, mechanical right knee pain, and chronic pain syndrome. (Id.). He advised the plaintiff that "she is entering into a phase of chronic pain syndrome" because the symptoms have been present for over five months, and that she would need to be treated more aggressively through either epidural steroids or treatment by a pain clinic. (Tr. 180-81). He prescribed Relafen and advised plaintiff to refrain from physically strenuous activities. (Tr. 181). Dr. Krishna also told plaintiff to return for a follow-up in six weeks. (Id.).

3

Plaintiff saw Dr. Krishna for a follow-up on April 17, 1998. Dr. Krishna diagnosed plaintiff with traumatic injury to the lumbar spine resulting in multilevel disc bulges; post-traumatic lumbar radiculopathy with active irritative features; and traumatic injury to the right knee resulting in a torn medial meniscus. (Tr. 163). Dr. Krishna based his findings on the MRIs of plaintiff's knee and spine, and on the EMG/nerve test. (Id.). He concluded that the plaintiff was totally disabled. (Id.). He advised her to refrain from work and strenuous activities, continue therapy on a weekly basis, take Vicodin ES to alleviate pain, wear a knee brace, and return for a follow-up in three months. (Id.). Dr. Krishna also requested authorization for payment from the Workers' Compensation Board to repeat the EMG/nerve test to see if the plaintiff's radiculopathy had worsened. (Id.). If that were the case, he recommended epidural steroid injections. (Id.).

On August 27, 1998, Dr. Krishna completed a residual functional capacity questionnaire. (Tr. 189-90). In response to the question: "In an 8-hour workday, claimant can (circle full capacity for each activity)," he noted that plaintiff could sit for 2 hours, and stand and/or walk for zero hours. (Tr. 189). However, someone wrote beneath the question "in one place at one time without changing positions." (Id.). Thus, it is not clear whether Dr. Krishna opined that plaintiff could only sit for 2 hours total in an 8-hour work day, or whether plaintiff could sit for only 2 hours at a time, but potentially more than 2 hours total in an 8-hour work day. Dr. Krishna noted that claimant could lift up to 20 pounds occasionally, and up to 10 pounds frequently, and use both hands for repetitive actions such as grasping, pushing, pulling, and fine manipulations. (Id.). He also opined that plaintiff could not bend, squat, crawl or climb at all. (Id.). Finally, Dr. Krishna noted that plaintiff could not be exposed to dust, fumes, or extreme air temperatures. (Tr. 190).

4

On December 2, 2003, at the behest of the ALJ, Dr. Krishna updated his residual functional capacity assessment. (Tr. 234-38). Dr. Krishna noted that he had last examined plaintiff on December 1, 2003, and had been examining plaintiff every three months. (Tr. 234). He said that his current diagnosis was cervical radiculopathy, lumbosacral radiculopathy, and right knee derangement. (Tr. 235). He said that plaintiff's prognosis was guarded, and that she was not able to return to work. Dr. Krishna explained that the plaintiff is unable to work due to persistent pain in her spine. (Id.). He opined that if plaintiff sits, she has to change her position every 20 to 30 minutes, and requires resting periods longer than one hour. (Id.). He also noted that plaintiff cannot stand for more than 20 minutes, and must change her position continually. (Id.). Dr. Krishna also opined that plaintiff cannot walk for longer than 20 minutes, and walking causes pain. (Id.). He concluded that the plaintiff has "difficulty in performing independently the activities of daily life." (Tr. 236).

**b) Treating Physicians Jupiter and Hecht**

Plaintiff first saw Dr. Barry Jupiter, orthopedic surgeon, on September 20, 1996, upon the referral of Dr. Vincent Amato, plaintiff's chiropractor/physical therapist. (Tr. 115). Dr. Jupiter opined that plaintiff suffered from internal derangement of the right knee and a sprained back. (Tr. 116). He advised her to continue with proper back and knee care, and prescribed Oruvail. (Id.). He also suggested that plaintiff receive an MRI scan of her back and right knee, and follow-up in four weeks. (Id.).

Dr. Jupiter and Dr. Robert Hecht, a doctor who works for the same facility as Dr. Jupiter, treated plaintiff between September 20, 1996 and July 13, 1998, on a roughly monthly basis. (Tr.

95-114). The doctors noted that plaintiff suffered from pain throughout this treatment period. (Id.).

Dr. Jupiter performed an arthroscopic surgery on plaintiff's right knee on April 3, 1997. (Tr. 107).

On June 17, 1997, Dr. Jupiter noted that plaintiff still had pain and swelling around the knee and

effusion. (Tr. 103). He also noted that plaintiff had seen Dr. Maury, an orthopedic IME, who

advised plaintiff to continue with orthopedic care and therapy. (Id.). On August 1, 1997, Dr. Jupiter

noted that plaintiff was still in a lot of pain about her back and knee, and that he "expect[ed]

permanency to her condition." (Tr. 102). Dr. Jupiter ordered an MRI in September, which revealed

that plaintiff suffered from a torn posterior horn and medial meniscus. (Tr. 100-01). He also noted

that plaintiff continued to experience diffuse tenderness, mild effusion, and clicking. (Tr. 101). On

October 17, 1997, Dr. Jupiter suggested that plaintiff receive intra-articular injections of Hyalgan

"[d]ue to [plaintiff's] grade III type findings on arthroscopic surgery, and persistent complaint and

findings." (Tr. 99). Dr. Jupiter opined that these injections might obviate the need for further

surgery. (Id.). On Febraury 23, 1998, Dr. Hecht saw the plaintiff and noted that he was still waiting

for authorization from the Workers' Compensation Board to give plaintiff the injections. (Tr. 97).

Dr. Hecht saw plaintiff again on July 13, 1998. (Tr. 96). He was still waiting for approval for the

injections. (Tr. 95). Dr. Hecht noted tenderness in plaintiff's lumbar spine and knee, and that

plaintiff had restricted range of motion. (Id.). He opined that plaintiff could not return to work.

(Id.). He recommended continuous nerve block treatment, which he rendered that day, providing

plaintiff with "some relief of pain." (Id.).

**c) Treating Physician Larkin**

Plaintiff saw Dr. Thomas G. Larkin on February 14, 1997. (Tr. 178). Dr. Larkin diagnosed plaintiff with internal derangement of the right knee. (Id.). He noted that she might have a torn lateral meniscus, even though no torn meniscus is seen on the MRI. (Id.). He also thought that she might have an anterior cruciate ligament tear. (Id.). Dr. Larkin noted that plaintiff had no improvement in physical therapy over four months and was ambulating with a limp and pain. He advised plaintiff to obtain a diagnostic right knee arthroscopy and meniscectomy, but advised against an anterior cruciate ligament reconstruction. (Tr. 178-79). As discussed above, Dr. Jupiter performed the arthroscopy on April 3, 1997. (Tr. 107).

**d) Treating Chiroprator/Physical Therapist Amato**

Plaintiff saw chiropractor/physical therapist Dr. Amato approximately three times per week from August, 16, 1996 through December 1998, and then subsequently less frequently until May 31, 2002, because of restrictions imposed by the Workers' Compensation Board. (Tr. 162, 167, 171, 253). On December 8, 2003, Dr. Amato completed a residual functional capacity assessment. (Tr. 240-57). He opined that plaintiff could sit, stand, and walk for one hour at a time before needing to change positions. (Tr. 240). He also opined that she could occasionally lift up to ten pounds, but could not carry anything. (Id.). He noted that she could not bend, crawl, or climb, but could occasionally squat. (Id.). He noted no other limitations. (Tr. 240-41).

## 2. Medical Evidence – Consultative Examiners

### a) Consultative Examiner Mancheno

Plaintiff was examined by consultative examiner Dr. Mario Mancheno on December 14, 1998. (Tr. 139). Dr. Mancheno opined that plaintiff's condition was consistent with discogenic disorder of the lumbosacral spine and consistent with surgery of the right knee for the removal of torn cartilage. (Tr. 140). He described plaintiff's prognosis as "fair." (Id.). He opined that plaintiff faced "moderate" impairment in lifting, carrying, standing, walking, pushing, pulling and sitting. (Tr. 141). He also noted that he did not find evidence of radiculopathy or muscle atrophy. (Id.). Although he did find some tenderness noted from L3 to S1 of the left and right paraspinal areas, he did not find any scoliosis, ridgidity or spasticity with regard to the lumbosacral spine. (Tr. 140). With regard to plaintiff's knee, Dr. Mancheno found no gross instability, signs of effusion, or swelling. (Id.). He did note the presence of crepitation and tenderness in the anterior and medial aspect. (Id.).

### b) Consultative Examiner Berlly

Plaintiff was also examined by Dr. Alan Berlly on December 14, 1998. (Tr. 142). He opined that plaintiff suffered from "facet arthropathy." He noted a "negative examination of the right knee," finding no evidence of fracture, effusion or osteoarthritic change. (Id.).

### c) Consultative Examiner Jasmin

Dr. J. B. Jasmin completed a residual functional capacity form for plaintiff on January 29, 1999. (Tr. 143-50) Dr. Jasmin opined that plaintiff could occasionally lift and/or carry up to 20

8

pounds, and could frequently lift and/or carry up to 10 pounds. (Tr. 144-50). Dr. Jasmin also opined

that plaintiff could sit, stand and/or walk for about 6 hours in an 8-hour work day. (Id.). The doctor

noted that plaintiff had occasional postural limitations which included climbing, balancing, stooping,

kneeling, crouching, and crawling. (Tr. 145). Dr. Jasmin concluded that plaintiff had no other

limitations. (Tr. 146-47). The doctor also noted that he had examined statements of plaintiff's

treating physicians and that his assessment did not differ significantly from their findings. (Tr. 149).


**d) Consultative Examiners Khattak**

Plaintiff was evaluated by consultative examiner Dr. Mohammad Khattak on July 14, 2003.

(Tr. 219-20). He noted that she was currently taking Vicodin and Celebrex daily. (Tr. 219). He

stated that plaintiff was ambulating without assistance and with a steady gait. He noted that she

could sit and stand normally, and was able to get on and off the examination table without assistance.

(Id.). He noted that she could rise on her toes and heels, and could squat and rise from the squatting

position. (Id.). He diagnosed plaintiff with S/P arthroscopy, and possible excision of torn meniscus

of the right knee, and ruled out spondylosis of the lumbosacral spine. (Tr. 220). He noted that

plaintiff's prognosis was "stable." (Id.). He opined that while the plaintiff's ability to bend and lift

may be "mildly limited," she had no limitations in sitting, standing, walking or reaching with gross

and fine manipulations in her hands. (Id.).

Also in the record is a "Medical Source Statement of Ability to do Work-Related Activities

(Physical)." (Tr. 215-18). The statement is dated July 14, 2003, but the signature on the report is

wholly illegible. (Tr. 218). It was most likely written by Dr. Khattak, because it is dated the same

date as his evaluation of plaintiff. (Id.). The Commissioner concedes that Dr. Khattak completed

9

the report. (Mem. in Supp. Def.'s Mot. for Remand ("Def.'s Mem") at 9 n.5). Dr. Khattak opined that plaintiff could occasionally lift and carry up to 50 pounds, and frequently lift or carry up to 20 pounds. (Tr. 215). He opined that plaintiff had no limitations in her ability to stand or walk. (Id.). While Dr. Khattak indicated that plaintiff's ability to sit, push and pull were affected by plaintiff's impairment, despite the instructions on the form, he failed to check the boxes indicating the extent of the limitations. (Tr. 216). He opined that plaintiff could frequently climb, balance, kneel, crouch, crawl and stoop. (Id.). He also indicated that plaintiff had no other limitations. (Tr. 217-18).

### e) Consultative Examiners Liebman

Also on July 14, 2002, plaintiff received a "radiographic examination of the lumbosacral spine," performed by Dr. Lawrence S. Liebman. (Tr. 221). Dr. Liebman noted that there was a posterior narrowing of the L3-L4 disc space, but no compression fracture. (Id.). He noted a straightening of the upper lumbar curvature. (Id.). Dr. Liebman also noted degenerative change in the facet joints at the L4-L5 and L5-S1 levels. (Id.). He diagnosed plaintiff with disc space narrowing and degenerative changes in the facet joints. (Id.).

### 3. Personal History

Plaintiff is a 47-year-old woman originally from Guyana. (Tr. 263). She attended school in Guyana through the age of 16 and came to the United States in 1989 (Tr. 58, 269, 282-83. Upon arriving in the United States, she took a home health aide course and then worked as a home health care worker from 1989 through the alleged onset date of August 8, 1996. (Tr. 58, 63, 269). She has not worked since her alleged onset date. (Tr. 264). On September 17, 1998, the Workers'

Compensation Board determined that plaintiff was permanently partially disabled as a result of her work-related injury. (Tr. 51). She had received benefits from September 26, 1996 through the date of the decision, with permanent benefits allotted at $190 per week. (Tr. 191).

Plaintiff lives in a first-floor apartment with her mother and 18-year-old daughter, who perform chores for plaintiff, including cooking and cleaning. (Tr. 264, 267). To cope with her lower back and knee pain, she takes Celebrex and Vicodin, which makes her drowsy and lightheaded. (Tr. 265, 269-70). She also continues to receive physical therapy twice monthly, which is what the Workers' Compensation Board allows. (Tr. 276). Plaintiff testified that she can neither stand nor sit for more than half an hour without needing to change positions. (Tr. 279)

## 4. The ALJ's Decision

The ALJ noted that "[a]lthough there are medically determinable impairments that could reasonably cause some of the symptoms alleged, the undersigned does not find the claimant's allegations credible." (Tr. 15). The ALJ then proceeded to provide a litany of diagnoses from the various treating and consultative physicians. (Tr. 15-16). Notably, the ALJ did not include treating physician Dr. Krishna's December 2003 opinion that plaintiff could not sit for longer than 20-23 minutes without needing to change positions, and that she requires resting periods longer than hour. (Tr. 15-16, 236). The ALJ then concluded that plaintiff retains the residual functional capacity to perform sedentary work. (Tr. 16). He noted that she could sit for 6 to 8 hours, stand and/or walk for 6 hours in an 8-hour day, and lift and carry 10 pounds. (Id.).

# DISCUSSION

## 1. Scope of Review

When reviewing the Commissioner's denial of SSI benefits, a district court must first examine whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal."). Next, the district court must determine whether the Commissioner's conclusions are supported by "substantial evidence." Tejada, 167 F.3d at 773; see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

The Supreme Court has defined the "substantial evidence" standard to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "In determining whether substantial evidence supports a finding of the [Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." Rivera v. Sullivan, 711 F. Supp. 1339, 1351 (S.D.N.Y. 1991). In making this determination, a district court must defer to the ALJ's resolution of any conflicting evidence. Clark v. Commissioner, 143 F.3d 115, 118 (2d Cir. 1998).

## 2. Standard for SSI Disability Determinations

Plaintiff seeks disability benefits under Title XVI of the Social Security Act. Under Title XVI, a claimant must demonstrate an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The statute further provides that:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy....

Id. at § 1382c(a)(3)(B).

The Commissioner determines whether a claimant meets the statutory definition of "disabled" in five, successive steps. See 20 C.F.R. § 416.920. These steps may be summarized as follows:

1. Is the claimant gainfully employed? If he is, then he is not disabled. If he is not, then the analysis proceeds to the second step.

2. Does the claimant have a "severe" impairment(s) – i.e., one that significantly limits his physical or mental ability to do basic work activities? If he does not, then he is not disabled. If he does, then the analysis proceeds to the third step.

3. Does the claimant's impairment(s) meet or equal a "listed impairment"? If it does, then he is disabled. If it does not, then the analysis proceeds to the fourth step.

4. Does the claimant's impairment(s) prevent him from doing his "past relevant work"? If it does not, then he is not disabled. If it does, then the analysis proceeds to the fifth and final step.

5.      Does the claimant's impairment(s), considered in conjunction with his residual functional capacity, age, education, and past work experience, prevent him from engaging in other substantial gainful work reasonably available in the national economy? If it does not, then he is not disabled. If it does, then he is disabled.

Id.

In applying the five-step inquiry, the ALJ found that: (1) plaintiff was not gainfully employed; (2) she does have "severe" impairments consisting of her "status post arthroscopic surgery of the right knee and discongenic disorder of the lumbrosacral spine; (3) these are not "listed impairments;" and (4) although plaintiff cannot perform her past relevant work, plaintiff is not disabled because she has the residual functional capacity to perform the full range of sedentary work. (Tr. 18).

While "[t]he burden of proving disability is on the claimant," "once the claimant has established a prima facie case that his impairment prevents his return to his prior employment [step four], it then becomes incumbent on the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the claimant could perform." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984). The ALJ found that plaintiff was unable to return to her past relevant work. (Tr. 18). Thus, it was Commissioner's burden to demonstrate that plaintiff was able to perform alternative work in the national economy.

**3. The Commissioner's Motion**

The Commissioner moved to remand for further proceedings because the ALJ did not resolve an alleged material inconsistency in the evidence. (Def.'s Mem. at 13). Specifically, the Commissioner argues that the ALJ failed to evaluate Dr. Krishna's December 2003 medical opinion

14

that plaintiff could sit for only 20 to 30 minutes at a time and required resting periods of longer than one hour. (Id. (citing Tr. 235)). As the Commissioner points out, an ALJ is required to consider every medical opinion in the record. (Id. (citing 20 C.F.R. § 404.1527(d))).

The Commissioner argues that remand for further proceedings, rather than for an award of benefits, is appropriate here. She asserts that it is the Commissioner's role to weigh the conflicting evidence, not the court's. The Commissioner argues that, "in view of the minimal findings and the other medical opinions in the record that plaintiff could sit for at least six hours in an eight-hour workday, it cannot be said that Dr. Krishna's opinion leads inexorably to a single conclusion that plaintiff is under a disability." (Def.'s Mem. at 13-14).

The Commissioner also notes that further administrative proceedings are necessary to determine whether Dr. Krishna's 2003 opinion relates back to the relevant period, since a claimant must establish that she became disabled during the period in which she met the insured status requirements of 42 U.S.C. §423(c). (Id. at 14). The Commissioner asserts that plaintiff last met the requirements on December 31, 2001. (Id. (citing Tr. 44)). Dr. Krishna never clarified whether his 2003 opinion related back to his earlier opinion, and, in fact, in his 1998 residual functional capacity assessment, Dr. Krishna noted that plaintiff could sit for 2 hours without needing to change position. (Tr. 198-90, 234-38). In addition, the Commissioner points out that Dr. Krishna's 2003 assessment contains a diagnosis of cervical radiculopathy, and lists that condition as one of the reasons why plaintiff cannot sit for long periods of time. (Tr. 235). According to the administrative record, this condition was neither diagnosed nor treated as of December 31, 2001.

15

## 5. The Treating Physician Rule

"The law gives special evidentiary weight to the opinion of the treating physician." Clark, 143 F.3d at 118. The treating physician rule requires the Commissioner to give deference to the opinion of a claimant's treating physician, unless that opinion is unsupported or contradicted by other evidence in the record.

The Social Security Administration regulations state:

> Generally, we give more weight to opinions from your treating sources.... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining what weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give [a claimant's] treating source's opinion.

20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

Here, Dr. Jupiter, plaintiff's treating orthopedic surgeon, opined on August 1, 1997 that plaintiff was in pain in her back and knee, and that he expected "permanency to her condition." (Tr. 102). Dr. Krishna, plaintiff's treating physician, opined in August 27, 1998, that in an 8-hour workday, plaintiff could sit for 2 hours in one place at one time without changing positions. (Tr. 189). Unfortunately, this opinion was ambiguous in that it could either mean that plaintiff could only sit for a total of 2 hours in an 8-hour day, or just 2 consecutive hours, but for a total of possibly more, during an 8-hour day. Dr. Krishna was later asked to clarify his earlier statement, and on December 2, 2003, he opined that plaintiff could not sit or stand for more than 20 to 30 minutes without needing to change position, and that she requires resting periods longer than one hour. (Tr. 235). Unfortunately, this second opinion does not clarify Dr. Krishna's earlier statement; rather, it simply

16

reflects that as of December 2, 2003, Dr. Krishna believed plaintiff to be disabled. As the Commissioner points out, the critical question is whether plaintiff was disabled as of the relevant date, which the Commissioner asserts is December 31, 2001.

I also note that, while plaintiff's chiropractor/physical therapist Dr. Amato opined that plaintiff could sit, stand, and walk for only one hour before needing to change positions (Tr. 240), a chiropractor is not an "acceptable medical source" under the Commissioner's regulations. See Diaz v. Shalala, 59 F.3d 313 (2d Cir. 1995) (citing 20 C.F.R. § 404.1513(a)). However, an ALJ may consider a chiropractor's opinion "to show the severity of [a claimant's] impairment(s) and how it affects [the] ability to work." 20 C.F.R. §§404, 1513(d)(1).

Before an ALJ can decline to give controlling weight to a treating physician's opinion, the ALJ must apply the following factors: "(i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)). Moreover, "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal, 134 F.3d at 505). Here, the ALJ failed to apply the Schaal factors and provide "good reasons" for discounting the assessments of Drs. Jupiter and Krishna. In fact, he wholly ignored Dr. Jupiter's 1997 and Dr. Krishna's 2003 opinions. He merely cited Dr. Krishna's 1998 opinion, explaining that Dr. Krishna:

> reported the claimant had traumatic injury to the lumbar spine resulting in multilevel disc bulges, post traumatic lumbar radiculopathy with active irritative features, and traumatic injury to the right knee resulting in torn medial meniscus. [Dr. Krishna]

17

opined on August 27, 1998, that the claimant in an eight hour day could sit in one place at a time [without] changing positions for two hours, stand and walk for zero hours, lift and/or carry ten pounds frequently and twenty pounds occasionally.

(Tr. 15-16). The ALJ then concluded that the plaintiff has the residual functional capacity to perform sedentary work. (Tr. 16). He noted that she could sit for 6 to 8 hours, stand and/or walk for 6 hours in an 8-hour day, and lift or carry 10 pounds. (Id.) However, the ALJ provided no explanation for his conclusion, and in particular, no "good reason" for discounting – and, with regard to Dr. Jupiter's 1997 and Dr. Krishna's 2003 assessments, wholly ignoring – the opinions of plaintiff's treating physicians. All the ALJ wrote between his restatement of Dr. Krishna's opinion and his conclusion with regard to plaintiff's residual functional capacity consisted of summaries of the opinions of consultative examiners Dr. Jasmin and Dr. Khattak, and the "Medical Source Statement of Ability to do Work-Related Activities (Physical)." (Tr. 15-16). The latter was authored by someone with "an illegible signature," whom the Commissioner concedes was Dr. Khattak. (Tr. 14, Def.'s Mem. 9 n.5).

On January 29, 1999, consultative examiner Dr. Jasmin completed a residual function capacity assessment and opined that plaintiff could stand, walk, and/or sit for about 6 hours in an 8-hour day. (Tr. 144-50). This is the only evidence in the record stating that as of the relevant date, December 31, 2001, plaintiff could stand and/or sit for 6 hours in an 8-hour day. The December 14, 1998 opinion of consultative examiner Dr. Mancheno – also ignored by the ALJ – opined that plaintiff faced "moderate" impairment in lifting, carrying, standing, walking, pushing, pulling and sitting. (Tr. 141). However, the ALJ properly disregarded this opinion because "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding ... considerable and constant exposure to medical evidence, to make the necessary

18

inference that [a claimant] can perform the exertional requirements of sedentary work." Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000) ("The inadequacy of Dr. Mancheno's opinion as a basis for the ALJ's decision to deny benefits to Curry is demonstrated further by the ALJ's implicit rejection of Dr. Mancheno's diagnosis.").

While the Commissioner points out that the relevant inquiry is whether plaintiff was disabled as of December 31, 2001, the only other medical sources which conflict with the assessment of plaintiff's treating physicians are from July 14, 2003. Consultative examiner Dr. Khattak filed a medical report which indicates that while plaintiff's ability to bend and lift may be "mildly limited," plaintiff had no limitations in sitting, standing, or walking. (Tr. 220). Yet, this assessment conflicts with the "Medical Source Statement of Ability to do Work-Related Activities" authored by someone with "an illegible signature," which the Commissioner concedes was written by Dr. Khattak. The statement indicated that, while plaintiff had no limitations in her ability to stand or walk, plaintiff was limited in her ability to sit, push, and pull. (Tr. 215-16). Unfortunately, the author of the report neglected to specify the extent of plaintiff's limitations. (Id.). "[T]he Commissioner [is] precluded from relying on the consultant's omissions as the primary evidence supporting [the] denial of benefits." Rosa v. Callahan, 168 F.3d 72, 81 (2d Cir. 1999) (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)). Thus, this statement itself does not support the denial of benefits to plaintiff, and, if the Commissioner is correct that Dr. Khattak authored this statement, serves to contradict Dr. Khattak's medical opinion that plaintiff has no limitations in sitting, standing or walking. However, regardless of whether Dr. Khattak indeed did author this report, his medical opinion from 2003 is both well past the relevant date of December 31, 2001, and,

even though still arguably relevant to plaintiff's status in 2001, conflicts with the 2003 opinion of treating physician Dr. Krishna.

Generally, upon a finding that an administrative record is incomplete or that an ALJ applied an improper legal standard, a district court remands the matter to the Commissioner for further consideration. See Shaw v. Chater, 221 F.3d 126, 134-35 (2d Cir. 2000) (remanding case because ALJ incorrectly applied treating physician rule). In other words, when "further findings would so plainly help to assure the proper disposition of [the] claim, ... remand is particularly appropriate." Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004) (quoting Rosa, 168 F.3d at 82-83 (2d Cir.1999)). However, where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision [the Second Circuit has] opted simply to remand for a calculation of benefits." Id.

Here, there is no "good reason" to disregard the 2003 opinion of plaintiff's treating physician Dr. Krishna. Under the standards set forth in Schaal: (1) he has treated plaintiff at least four times annually since her accident in 1996 (Tr. 234); (2) his diagnoses are supported by MRIs, EMG/nerve conduction tests, and the opinions of other treating physicians (Tr. 91, 92, 100-02, 116, 178, 221); (3) his opinion is consistent with the record as a whole except for the opinions of consultative examiners Dr. Jasmin and Dr. Khattak (Tr. 144-50, 220); and (4) Dr. Krishna is a neurologist, and therefore a specialist. See Schaal, 134 F.3d at 503. Thus, there can be little doubt that plaintiff, as of 2003, was likely disabled.

However, as noted by the Commissioner, the relevant inquiry is whether plaintiff was disabled as of the relevant date, December 31, 2001. As of that date, Dr. Krishna opined that plaintiff could, in an 8-hour workday, sit for 2 hours, and walk and/or stand for zero hours "in one

place at one time without changing position." (Tr. 189). Again, as I explained above, this statement is ambiguous. Moreover, Dr. Krishna failed to correct this ambiguity when he wrote in 2003 that plaintiff could sit for no more than 20 to 30 minutes at one time. (Tr. 235). Under these circumstances, the appropriate course is to remand for further administrative proceedings, directing the ALJ to ask Dr. Krishna to specifically address plaintiff's residual functional capacity as of December 31, 2001. Dr. Krishna's opinion on April 17, 1998, that plaintiff was "presently totally disable[d]," is too conclusory to justify a remand solely for calculation of benefits. Further, if the ALJ is inclined to not give deference to Dr. Krishna's medical opinions, the ALJ is directed to apply the Schaal factors before declining to do so. See Schaal v. Apfel, 134 F.3d at 503 (citing 20 C.F.R. § 404.1527(d)(2) and 416.927(d)(2)).

## CONCLUSION

A remand for further administrative proceedings, as directed above, is appropriate in this case. I do recognize that "plaintiff's application has been pending more than six years and that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay." Curry, 209 F.3d 117, 124. For this reason, the further proceedings before an ALJ must be completed within 90 days of the issuance of this order and, if that decision is a denial of benefits, a final decision of the Commissioner must be rendered within 90 days of plaintiff's appeal from the ALJ's decision. See Butts, 388 F.3d at 387.

SO ORDERED:

s/Edward R. Korman

Dated: May __, 2005
Brooklyn, New York

Edward R. Korman
United States District Judge